UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-159 (SRN/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S AMENDED** |
| | ) | **SENTENCING POSITION** |
| NATHAN JOHN WALZ, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Esther Soria Mignanelli, Assistant United States Attorney, hereby submits this position paper as to sentencing factors. The government respectfully requests that the Court sentence defendant Nathan John Walz to a term of imprisonment of 120 months. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing in light of the dangerousness of the offense as established at trial, and the defendant's history and characteristics, which, although unaddressed at trial, confirm a strong connection to the Bloods street gang.

## I.   NATHAN JOHN WALZ'S DRUG TRAFFICKING AND FIREARM OFFENSES

On November 1, 2022, at approximately 7:50 a.m., Minneapolis Police Department ("MPD") officers were dispatched to the intersection of Knox Ave South and Summit Ave in the Lowry Hill neighborhood of Minneapolis. (*See* Presentence Investigation Report ("PSR"), ECF No. 71, at ¶ 19.). Officers approached the car, and identified Mr. Walz, the only occupant, slumped over the steering wheel with the car

running and his foot on the brake. (*Id.*) As officers first made contact with Mr. Walz, they saw a handgun on the center console/armrest of the car directly next to Mr. Walz. (*Id.* at ¶ 20.)  The firearm next to Mr. Walz was a Kimber, model Super Custom Carry, .45 caliber semi-automatic pistol, bearing serial number K314454. (*Id.*)

On the front passenger's seat, in a hard carrying case, and in other locations in the car, officers found: approximately 29.3 grams of methamphetamine, approximately 21.5 grams of pills containing methylenedioxymethamphetamine (MDMA), and approximately 22.3 grams of bromazolam. (*Id.*)

As presented at trial, officers also found indicia of drug trafficking, to include digital scales and plastic baggies; at least one "trap" or "cut-out" in the car, in which they discovered a gun holster; and numerous electronic devices, including five cell phones, two tablets, and a laptop (*see* Government's Trial Exhibit ("GEX") 5A, 9).

As a result of Mr. Walz's criminal conduct, he was charged in a three-count indictment, with possession with intent to distribute 5 grams or more of actual methamphetamine (in violation of 21 U.S.C. § 841(b)(1)(B)); felon in possession of a firearm (in violation of 18 U.S.C. § 922(g)); and possessing a firearm in furtherance of drug trafficking (in violation of 18 U.S.C. § 924(c)). (ECF No. 1.)

## II.   NATHAN JOHN WALZ'S AFFILIATION WITH THE BLOODS

According to cooperating sources, members of the Minneapolis Bloods have, in recent years, increased their narcotics and firearms trafficking activities in and around South Minneapolis, and Bloods generally expect to be protected by other

Bloods while engaged in such illegal activities within their territory. *See, e.g., United States v. Ferguson et al.*, 23-mj-366, ECF 2-1, at 2.

The Bloods have two main sub-gangs, namely the Rolling 30's Bloods and the Outlaw Bloods. Members and associates are involved with crimes to include homicides and shootings. Members of the Bloods often display, publicly, indicia of membership, including the wearing of clothing, hats or other paraphernalia colored red, utilizing and displaying gang signs for the Bloods or the neighborhood in South Minneapolis, and obtaining tattoos identifying the Bloods or its members, associates or territory. In South Minneapolis, the Bloods control several blocks of territory, where they conduct illegal narcotics transactions, commit robberies and/or burglaries, intimidate members of the public or witnesses, and commit acts of violence or other crimes.[1]

Mr. Walz is recorded in several calls placed to a MN Department of Corrections inmate ("BHT") talking about firearms, drug trafficking and other Bloods-related activities. For example, on or about October 8, 2020, Walz tells BHT, in part, "I don't want to push no line no more because it kind of been spicy with me in the hood lately." BHT asked, "What you mean?" Walz responded, "Ummmm shit bunch of shit. Too old to be getting fuckin fake ass violations and shit my n****." BHT replied, "Who trying to give out violations?" Walz replied, laughing, "Younger n****s that's not even in my

---

[1] The Government will make an agent-witness available at sentencing if the Court would like testimony on these subjects (and the interpretations of the calls submitted as exhibits) from a Department of Corrections investigator witness with decades of gang-related investigative experience.

gang." (*See* October 8, 2020 Call, File Name ending 191.wav, submitted as "Exhibit A.")[2]

In a September 2021 call, Walz appears to complain to BHT about a younger member or associate of the gang who will not sell or front Walz narcotics to Walz's liking. Specifically, the call contains the following conversation:

Walz: I'm really mad at the lil homies for, for, for doing me bogus but.

BHT: Who which one?

Walz: Lil J.

BHT: What'd he do?

Walz: Man, I done gave this nigga pounds and pounds and pounds, you know what I'm saying? And then this n**** acting funny about selling me a snigget. N****, after all that shit, and you owe me money n****.

BHT: Yeah.

Walz: You got me fucked up n****.

BHT: Motherfuckers ain't as real as they portray to be brother.

(*See* September 9, 2021 Call, File Name ending 191.wav, submitted as "Exhibit B.")

In a November 2020 call, Walz discusses firearms (referred to as "whoops" or "hammers" in the call), working a security job in the "Square" (believed to be a reference to George Floyd Square and surrounding neighborhood), and concerns

---

[2] The Government's Exhibits referenced in this memorandum are being contemporaneously provided to defense counsel via a cloud-based file sharing system. A drive with electronic copies of the Exhibits will also be provided to the Court as soon as practicable.

regarding associates talking to law enforcement about his activities. For example, during part of the call, the following exchange takes place:

> Walz: (Laughs) Yeah. I just don't want my loyalty to get my ass fuckin' on some bullshit with some n****s that ain't loyal.

> BHT: Man just, just listen Blood. I done escaped 3 indictments you know what I'm saying?

> Walz: Yeah.

> BHT: So you can keep escaping them too. Just stay away from n****s man I'm telling you man, keep your circle small, you will be just fine.

> Walz: Yeah I don't even really fuck with nobody, I just be out here because I have to for the little barrier thing. . .

(*See* November 12, 2020 Call, File Name ending 191.wav, submitted as "Exhibit C.")

During this investigation, agents also searched two of Mr. Walz's phones. His phone communications contain conversations related to narcotics trafficking with other individuals who have been identified in this investigation as members of the Bloods. For example, on or about August 14, 2022, in a conversation with Jordan Edwards[3] that appears to be regarding making a purchase of narcotics from Mr. Walz's source of supply, Walz states, "Man on bloods I been giving u my price I need to at least get sum gas money or sum." Edwards responds, "Whats his number ill go." Later in the conversation, Walz states this supplier/individual is in "Prior Lake." (*See*

---

[3] Jordan Edwards has been identified by cooperating sources as a member of the Bloods. He is charged with narcotics and firearms violations in a related case pending at 23-cr152 (SRN/TNL).

GEX35A, at 30–31.) On or about September 11, 2022, Edwards appears to be angry with Walz over the pricing of narcotics. During part of the conversation, Edwards stated, "You keep saying that, BLOOD EVERY BODY SELL EM $100 for 50. You nut cutting me no deal blood thats REGULAR PRICE." (*Id.* at 71.) Later in the conversation Edwards clarifies that they are discussing the price for pills. (*See id.* at 72 ("WHOS PAYING 200$ for 50 pills blood").

## III.   PSR AND THE ADVISORY GUIDELINES RANGE

### A.   Sentencing Range

As set forth in the PSR and pursuant to USSG §2D1.1(a)(5), (c)(10), the base offense level for the highest-level offense (between Counts 1 and 2) is 20, because the total converted drug weight was 64.75 kilograms, which is greater than 60 kilograms but less than 80 kilograms of converted drug weight. (PSR ¶ 26). In addition, the guideline for a violation of 18 U.S.C. § 924(c)(1)(A) is the minimum term of imprisonment required by statute, or a 60 months' consecutive imprisonment term. (PSR ¶ 43.) In criminal history category II, the guideline range for Counts 1 and 2 is 37 to 46 months' imprisonment. (PSR ¶ 100.) Together with the 60-month mandatory minimum term of imprisonment for Count 4, the total guideline range starts at 97 to 106 months' imprisonment, which becomes 120 months by operation of the mandatory minimum.  USSG § 5G1.1(b).

## IV.   SENTENCING FACTORS

6

The government respectfully asserts that a sentence of 120 months' imprisonment is appropriate. The sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; and (3) the need for the sentence to promote respect for the law and to afford adequate—are addressed below.

A.  **The Nature and Circumstances of Mr. Walz's Offense Warrant a Guidelines-Range Sentence of 120 Months.**

As the Court is aware, Minneapolis and St. Paul have been beset with gun violence in recent years. More people were killed in 2021 than any year in the more than 150-year history of those cities. And between 2019 and 2022, shooting-related calls to law enforcement more than doubled.

As the Supreme Court has observed, in enacting the felon-in-possession statute, "Congress determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). In enacting this statute, "Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Small v. United States*, 544 U.S. 385, 393, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) (internal quotation marks omitted). Simply put, "[g]uns do not belong in the hands of felons," *United States v. Conley*, 291 F.3d 464, 473 (7th Cir. 2002), and the reason for that is clear: "Once the gun is in the defendant's hands, he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim.'" *United*

*States v. Matthews*, 520 F.3d 806, 809 (7th Cir. 2008) (quoting *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001)).

The threat to members of our community posed by the gun in Mr. Walz's possession was severe. Not only was he carrying a firearm in furtherance of drug trafficking—and while under the influence himself. His communications and past crimes indicate a readiness to use the firearm he unlawfully possessed. For example, his May 2021 conviction stemmed from and encounter with a victim Mr. Walz pointed a firearm at after he was asked to exchange ten dollars in cash for ten dollars on a debit card. (*See* PSR ¶ 57.)

A significant sentence of incarceration is appropriate to reflect the seriousness and the nature and circumstances of Mr. Walz's gun and drug crimes, which the government respectfully asserts is a prison term of 120 months.

**B.   A Guideline-Range Sentence of 120 Months Appropriately Reflects Mr. Walz's History and Characteristics.**

Mr. Walz's history and characteristics, as detailed in the PSR, reflect a picture of someone who had all the support and chances that, too often, defendants before this Court will never have the luck or luxury of seeing. This is aggravating, especially in light of the criminal organization Mr. Walz has elect to associate himself with despite having the option of a supportive network at home.

Mr. Walz's conduct in this case, along with his own communications that have been unearthed in the related investigation, lay bare some of his characteristics: he allied himself with individuals who will support and encourage and protect his drug trafficking activities, and he looks down on others who violate his own sense of

"loyalty" to the Bloods by speaking to law enforcement. His apparently deep connection to, and membership within, an organization that has become known for its acts of violence across Minneapolis is concerning. It is another factor that supports the significant Guidelines sentence respectfully requested by the Government.

### C. A Guideline-Range Sentence of 120 Months Appropriately Reflects the Need for the Sentence Imposed to Afford Adequate Deterrence and Promote Respect for the Law.

There is a substantial need for specific deterrence in this case, not only because of Mr. Walz's affiliation with the Bloods, but also because he has been a victim of shootings in the past—and that was not enough to deter his use or possession of firearms. Rather, from some of his communications, it appears to have been a basis for Mr. Walz to justify his possession of a firearm moving forward. *See* Ex. C (stating "I aint never lackin' [unarmed]" in the context of a conversation believed to be about "everybody" having a gun).

There is also a substantial need for general deterrence in this case. Felons who possess weapons unlawfully, purportedly under the "protection" of a criminal organization that expects "loyalty" in the form of not ever talking to law enforcement and/or intimidating those who do, must hear the message that such conduct will result in severe consequences. A Guideline sentence of 120 months will show this defendant—and others so inclined—that they cannot continue to disobey drug and gun laws in the District of Minnesota without significant consequences.

## III.   REQUEST FOR FIVE YEARS' SUPERVISED RELEASE

Pursuant to 18 U.S.C. § 3583(b)(3), the Court may impose a term of not more than five years of supervised release. The Guidelines provide for a term of supervised release of one to three years for Counts 1 and 2, pursuant to Guideline § 5D1.2(a)(2), and two to five years for Count 3, pursuant to Guideline §5D1.2(a)(2). (PSR, ¶ 104.)

A five-year term of supervised release provides a significant period during which defendant will be supervised as he reintegrates into society, particularly in light of the concerning organization he chose to surround himself with after becoming more estranged from his family. The government agrees with the Probation Office's recommendations for the conditions of supervised release to be imposed in this matter as outlined below, as the facts underlying the offense and detailed in the PSR support the imposition of those conditions. *See* PSR, at ¶¶ 122-127.

## V.   CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court sentence Nathan John Walz to a 120-month term of imprisonment.

Dated:  November 20, 2023                    Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*/s/ Esther Soria Mignanelli*
BY: ESTHER SORIA MIGNANELLI
Assistant U.S. Attorney